A97A0816. POTTS et al. v. UAP-GA AG CHEM, INC. et al.
(490 SE2d 432)

ANDREWS, Chief Judge.
Potts, Jr., administrator of the estate of Rusty LeBlanc, LeBlanc's widow, Phillips, and Phillips on behalf of LeBlanc's minor child appeal from the trial court's grant of summary judgment to UAP-GA AG CHEM, Inc. (UAP) and Register, a UAP employee, in their wrongful death and survival action[1] alleging fraud and intentional infliction of emotional distress against UAP and Register.

1. In reviewing grant or denial of summary judgment, this Court conducts a de novo review of the evidence. *Goring v. Martinez*, 224 Ga. App. 137, 138 (2) (479 SE2d 432) (1996); *Gaskins v. Hand*, 219 Ga. App. 823 (466 SE2d 688) (1996).

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a

---

[1] Canaan Industries and Dowelanco, a general partnership, the manufacturer and seller, respectively, of chemicals to UAP are also defendants below and the claims against them remain pending there.

jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial. [Cit.] A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

So viewing the evidence, it was that LeBlanc, 29 years old, worked for UAP at its Sylvester, Georgia branch as a truck driver. That branch had four employees, including LeBlanc. Defendant Register was the branch manager, Jordan was the warehouse manager, and Phillips worked in the warehouse.[2] UAP accepted and distributed farm chemicals, including pesticides, and provided applicators to farmers for applying its products to their fields.

On Friday, August 13, 1993, Register gave instructions to Jordan that one of the applicators be washed off. He was aware that LeBlanc could be asked to perform such a task. Phillips and LeBlanc then washed off all ten to fifteen applicators on the lot. The applicators had granular chemicals caked on them and it was necessary to use a pressure washer to dislodge the chemicals. After cleaning the applicators, LeBlanc became nauseated, suffered a headache, and became dizzy. LeBlanc told his wife upon arriving home that he had gotten chemicals on him. He suffered nausea, diarrhea, and vomiting through the weekend and missed work on Monday.

On Friday, August 20, LeBlanc told Phillips that he had again washed the applicators while Phillips was gone and had again gotten ill. On Saturday, his wife took LeBlanc to Palmyra Hospital's emergency room where he was given fluids and sent home with direction to return if he did not improve. Early Sunday morning, he returned to the hospital and was admitted by Dr. Frankos. LeBlanc advised Dr. Frankos of his daily exposure to chemicals. Dr. Frankos treated LeBlanc for acute gastroenteritis and was of the opinion that chemical poisoning was "pretty low on the list" of potential diagnoses. LeBlanc was released on August 24 on a clear liquid diet for 24 hours, then a bland diet for 24 hours, and scheduled for a followup visit.

---

[2] This is the same Phillips to whom LeBlanc's widow was married after his death.

LeBlanc's wife took him to Worth County Hospital on August 24, 1993, because of his continuing nausea, diarrhea, and vomiting, and he was admitted to Dr. Capps' service. Dr. Capps was aware that LeBlanc had previously been in Palmyra Hospital and was told by LeBlanc that he suspected food poisoning or that "he had been exposed on his job to chemicals." Dr. Capps found his symptoms to be consistent with those caused by a cholinesterase inhibitor, an organophosphate used in farm chemicals, and performed tests to pursue this issue.

On August 25, Dr. Capps "put him on Atropine [an antidote for a cholinesterase inhibitor] and while on Atropine changed his Donnatal to Donnagel, which doesn't contain the Atropine-like substance that Donnatal does, so I didn't want to duplicate that." Dr. Capps also testified that, in his experience, exposure to organophosphates tended to be a fairly acute, short-lived toxic experience and, based on his conversation with Register on LeBlanc's third day of hospitalization, "I feel like I've treated him for a period long enough to cover the kind of exposure that I'm familiar with. . . . So that's why, . . . on the date I indicated that I went ahead and stopped the Atropine. I really felt like I had done all I could do with that without any more specific information."

Dr. Capps discontinued the Atropine on August 27 at 1:10 a.m. because "I felt that the main purpose of Atropine in that form and in that dosage would be to cover the possibility that he had been exposed to a toxic chemical. I expected that exposure to result in a short-term toxic syndrome, and I had been reassured by his employer [Register] that he could not possibly have been exposed to any chemicals. . . . [H]e said, 'he's not around chemicals.'" Had he been advised by Register of exposure to such chemicals, "the only thing I would have done differently had I been told the specific nature of a poison is to try to find out if it had any weird, unexpected, long-term or any permutation on this general theme that should alter my approach."

LeBlanc improved on August 29, but then worsened on August 30. Although LeBlanc had been taken off Atropine, "[h]e was getting anticholinergics the entire time. I never discontinued anticholinergics. He was switched from Atropine to an oral form. I doubt the anticholinergics were stopped until he got to Palmyra."

Dr. Capps transferred him to Palmyra Hospital where he was seen by Dr. Burnette on August 30 to consider the possibility of gall bladder problems. Dr. Burnette determined the problem was not the gall bladder and, based on LeBlanc's and his wife's statement that, two weeks previously, he had been exposed to chemicals, he was again administered Atropine. When LeBlanc did not improve, his care was transferred to Dr. Dorsey, an internist who was also told

about LeBlanc's exposure to chemicals.

Dr. Dorsey examined LeBlanc, including reviewing records of the earlier Palmyra stay and was aware from Dr. Burnette's history as well as LeBlanc's information that LeBlanc had been exposed to chemicals. Dr. Dorsey did not have LeBlanc's records from his Worth County Hospital stay. Despite continued treatment by Dr. Dorsey, LeBlanc died on September 3, 1993. Although an autopsy was performed, no definitive cause of death was identified by the pathologist, Dr. Isele. Dr. Isele was asked if he had ruled out "absolutely acetylcholinesterase poisoning" and replied "[i]n my mind, yes." Also, Dr. Dorsey testified that "I did not feel that Mr. LeBlanc's signs and symptoms, at the time that I entered the case or first saw Mr. LeBlanc, were consistent with cholinesterase or organophosphate poisoning."

On June 9, 1994, a claim for workers' compensation benefits was filed on behalf of Phillips and her daughter asserting that LeBlanc "was exposed to toxic and poisonous materials and died as a result of this exposure."

2. Pretermitting the issues of (a) whether there has been an intervening proximate cause between the alleged fraudulent statement of Register to Dr. Capps, i.e., the treatment by two succeeding doctors who were not aware of Register's statement, but were aware of chemical exposure, see *Stegall v. Central Ga. EMC*, 221 Ga. App. 187, 190 (2) (470 SE2d 782) (1996) and (b) whether there was any showing made that Register's statement was made to induce *LeBlanc* to act or refrain from acting in reliance on the statement and that *LeBlanc* justifiably relied on it, see *Watson v. Zurich-American Ins. Co.*, 221 Ga. App. 4, 5 (1) (470 SE2d 684) (1996) and *Maddox v. Southern Engineering Co.*, 216 Ga. App. 6, 7 (1) (453 SE2d 70) (1995), we address the exclusivity provision of OCGA § 34-9-11 to determine whether any viable fraud or intentional infliction of emotional distress claim has been shown by Potts and Phillips that is outside the scope of that section.

As stated by the Supreme Court, "[t]he workers' compensation law provides benefits to an employee injured in an accident arising out of and in the course of the employment. The legislature has expressly codified its intent that the Act be liberally construed to bring both employers and employees within the act. Where the Act is applicable, its provisions are the exclusive remedy for the employee against the employer. . . . The exclusivity provision is the bedrock of the workers' compensation system. The legislature has determined that it is the quid pro quo for workers receiving a guarantee of prompt benefits for work-related injuries without regard to fault or common-law defenses and without the delay inherent in tort litigation. Workers' compensation has never been intended to make the

employee whole — it excludes benefits for pain and suffering, for loss of consortium, and it provides a cap on wage benefits." *Doss v. Food Lion*, 267 Ga. 312, 313 (1) & (2) (477 SE2d 577) (1996). That case held that the intentional delay of medical treatment by the employer/insurer which exacerbates an existing work-related physical injury does not provide the employee with an independent cause of action beyond workers' compensation.

The only enumeration of error urged is that the trial court erred in concluding that the immunity that "protects employers and fellow-employees under the Workers Compensation Act, extends to intentional misconduct by the employer done off the worksite and at times that the employee is not engaged in any work activity." Although numerous other theories are argued in the brief, this is the only ground which we consider. *Powell v. State*, 210 Ga. App. 409, 414 (7) (437 SE2d 598) (1993).

Appellants rely upon *Griggs v. All-Steel Buildings,* 209 Ga. App. 253 (433 SE2d 89) (1993) for their contention that the employer is not protected from a fraud claim by an employee. There, this Court held that fraud by the employer and insurer in settling a workers' compensation claim with an employee who had been brain injured on the job was "not an 'accident' and the damages resulting therefrom do not arise 'out of or in the course of the employment,' but rather, result from the intentional misconduct of the defendants subsequent to the physical injuries which gave rise to the original workers' compensation claim [and suit was not barred by OCGA § 34-9-11]." Id. at 255. See also *Boulware v. Quicktrip Corp.*, 226 Ga. App. 399 (486 SE2d 662) (1997).

UAP and Register rely upon *Southwire Co. v. Benefield*, 184 Ga. App. 418 (361 SE2d 525) (1987), which held that "when an employee's injuries are compensable under the Act, he is absolutely barred from pursuing a common law tort action to recover for such injuries, even if they resulted from intentional misconduct on the part of the employer. [Cits.]" Id. at 419. The misconduct alleged there was a conspiracy to commit fraud, deceit, and medical malpractice by withholding knowledge that the employee had been exposed to lead poisoning in the workplace.

We need not resolve the conundrum posed by these arguably conflicting holdings, however, because the only alleged fraud put forth by appellants is that committed by Register, a co-employee of LeBlanc. In this situation, as found by Judge Blackburn, author of *Griggs*, supra, in *Wall v. Phillips*, 210 Ga. App. 490 (436 SE2d 517) (1993), "[u]nder OCGA § 34-9-11 (a), 'the Georgia Workers' Compensation Act is now the exclusive remedy for injuries sustained by an employee during the course of employment resulting from the negligence of a co-worker.' [Cit.] *This bar also applies to intentional torts*

*committed by one worker against a co-worker, unless the tortious act was committed for personal reasons unrelated to the conduct of the employer's business. Murphy v. ARA Svcs.*, 164 Ga. App. 859 (298 SE2d 528) (1982)." (Emphasis supplied.) *Wall*, supra at 491.

Here, there has been no showing made of any such personal animosity between Register and LeBlanc and Register and UAP were entitled to summary judgment. *Zaytzeff v. Safety-Kleen Corp.*, 222 Ga. App. 48, 49 (2) (473 SE2d 565) (1996); *Baldwin v. Roberts*, 212 Ga. App. 546 (1) (442 SE2d 272) (1994); see *Johnson v. Hames Contracting*, 208 Ga. App. 664, 667 (4) (431 SE2d 455) (1993).

*Judgment affirmed. Birdsong, P. J., Beasley, Smith, Ruffin and Eldridge, JJ., concur. McMurray, P. J., dissents.*

McMURRAY, Presiding Judge, dissenting.

The fraud and intentional infliction of emotional distress alleged by plaintiffs was not an accident arising out of and in the course of employment. OCGA § 34-9-1 (4). Instead, plaintiffs rely upon the intentional misconduct of defendant Register subsequent to the physical injuries upon which any workers' compensation claim is predicated. Therefore, I would hold that this lawsuit is not barred by OCGA § 34-9-11. In my view, the controlling analysis is that set forth in *Griggs v. All-Steel Buildings,* 209 Ga. App. 253 (433 SE2d 89). The reliance of the majority upon *Wall v. Phillips,* 210 Ga. App. 490 (436 SE2d 517) is misplaced since that case involves a suit based on an injury compensable under the Georgia Workers' Compensation Act. The injuries which plaintiffs allege in the present case were inflicted upon Rusty LeBlanc while he lay in a hospital bed, bear no causal connection to the conditions under which his work was performed, and are not compensable under the Act. Plaintiffs having presented evidence of fraud, reliance, and resulting injuries, there are genuine issues of material fact requiring jury resolution. Therefore, I respectfully dissent.

DECIDED JULY 14, 1997 —
RECONSIDERATION DENIED JULY 31, 1997 —

*Stephen L. Ivie, John M. Brown,* for appellants.

*King & Spalding, J. Kevin Buster, Carmen R. Toledo, Gardner, Willis, Sweat & Goldsmith, Donald A. Sweat, Farmer, Farmer, Malone & Sherrer, R. Martin Adams, Charles M. Goetz, Jr.,* for appellees.